**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY IEZZI** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 23-2827** |
| | : | |
| **CROSSCOUNTRY MORTGAGE, LLC** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                            **January 3, 2024**

CrossCountry Mortgage twice offered Anthony Iezzi a job in business development. CrossCountry sent Mr. Iezzi an employment agreement with a mandatory arbitration obligation both times.  Mr. Iezzi reviewed the employment agreement. CrossCountry required Mr. Iezzi to review, and if he wanted the job, agree to mandatory arbitration for certain defined disputes arising from his employment. Mr. Iezzi signed the employment agreement including a mandatory arbitration obligation after CrossCountry sweetened the second offer months later with more pay. CrossCountry later terminated Mr. Iezzi's employment. He now sues CrossCountry claiming wrongful termination based on age and disability discrimination. Mr. Iezzi claims he never read the mandatory arbitration language contained in the employment agreement.

CrossCountry moved to compel mandatory contractual arbitration and dismiss the case in court. Mr. Iezzi argues the mandatory arbitration obligation cannot be enforced as unconscionable. We granted leave for limited discovery to develop facts relating to Mr. Iezzi's unconscionability arguments. The parties did not clearly require the arbitrator to decide if the dispute is arbitrable. So we must do so. We reviewed the now-developed record. There is no genuine dispute of material fact regarding the applicability of the arbitration obligation. We enforce the obligation. We decline to dismiss today but stay Mr. Iezzi's claims before us with filed status reports to ensure progress in the mandatory arbitration consistent with Federal Rule 1.

I.      **Facts pleaded and adduced in discovery.**

Anthony Iezzi worked remotely for CrossCountry Mortgage, LLC d/b/a CrossCountry Mortgage from August 2021 to November 2022 as a Business Development Specialist.[1] CrossCountry is a mortgage lending company.

*Mr. Iezzi's education and experience.*

Mr. Iezzi graduated high school and completed some English, history, marketing, and international business classes at community colleges.[2] Mr. Iezzi worked in managerial and supervisory positions in the mortgage industry for almost two decades alongside wealthy developers.[3] Mr. Iezzi handled "multimillion dollar developments" worth "hundreds of millions of dollars."[4]  He has expertise in negotiating and obtaining Marketing Service Agreements with real estate developers including negotiating the terms with attorneys.[5] He attended boardroom meetings with wealthy developers, lawyers, and accountants where he shared his expertise in making non-warrantable condominiums "mortgageable residentially."[6]

*CrossCountry offers Mr. Iezzi a job.*

CrossCountry first offered Mr. Iezzi a job in March 2021.[7] CrossCountry uploads its employment on-boarding documents to DocuSign, an online platform for sending, signing, and managing documents electronically.[8] CrossCountry's Corporate Designee testified applicants are typically given five days to review employment documents.[9]

CrossCountry sent Mr. Iezzi a copy of the Employment Agreement via DocuSign link on March 2, 2021.[10] Mr. Iezzi declined CrossCountry's March 2, 2021 offer of employment because he thought CrossCountry did not offer to pay him enough money.[11]

*CrossCountry again offers employment to Mr. Iezzi with more pay.*

The parties renewed discussions about Mr. Iezzi's potential employment in July 2021.[12]

CrossCountry made Mr. Iezzi another offer of employment in August 2021.[13] CrossCountry emailed Mr. Iezzi an August 19, 2021 Offer Letter with compensation terms, benefits information, and other details related to the terms of Mr. Iezzi's employment.[14] CrossCountry also sent its Employment Agreement on August 19, 2021 to Mr. Iezzi.[15]

Mr. Iezzi responded: "I'm not sure I'm understanding this correctly[.] I believe the salary and length of time is wrong. Unless that is a bonus plus a salary for 12 months."[16] CrossCountry's Divisional Vice President emailed Mr. Iezzi the next morning to set up a call with Mr. Iezzi and Mr. Iezzi's soon-to-be manager to discuss the offer letter and answer Mr. Iezzi's questions.[17]  Mr. Iezzi responded at 10:57 A.M. asking the Vice President to call his cell phone at 11:30 A.M.[18] The manager responded to the email thread at 11:12 A.M. stating: "Offer as is isn't valid after our dialogue yesterday."[19]

Mr. Iezzi signed the August 19, 2021 Employment Agreement and the Offer Letter four days later on August 24, 2021.[20]

### *Mr. Iezzi and CrossCountry's arbitration obligation.*

CrossCountry and Mr. Iezzi's Employment Agreement contained a mandatory arbitration obligation requiring each of them resolve all claims and disputes "arising from, related to, or having any relationship or connection whatsoever with [Mr. Iezzi] seeking employment with, employment by, or other association with [CrossCountry]" only by binding arbitration.[21] The arbitration obligation applies to "all disputes, whether based in tort, contract, statute, equitable law, or otherwise."[22] Mr. Iezzi and CrossCountry are entitled to "[a]ny relief that would otherwise be available in a court action."[23]

CrossCountry excludes certain claims from binding arbitration including "workers' compensation claims, unemployment compensation claims, or the right to file an administrative

charge before a governmental agency, such as the Equal Employment Opportunity Commission (EEOC) … or other claims that as a matter of law cannot be subject to arbitration."[24]

### *The parties defined governing arbitration forum and governing law, but also consent to personal jurisdiction in Ohio courts.*

Mr. Iezzi signed the Employment Agreement providing "any claim, dispute and/or controversy" between Mr. Iezzi and CrossCountry "shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act ('FAA')."[25] The parties further agreed arbitration must be "administered by the American Arbitration Association before a qualified individual to whom the parties may mutually agree pursuant to [American Arbitration Association's] Employment Arbitration Rules and Mediation Procedures."[26] Arbitration procedures "shall be governed by the Ohio Code of Civil Procedure and Ohio Rules of Court."[27] Ohio state law applies to the "validity, interpretation, performance and enforcement of" the Employment Agreement as a whole.[28]

The parties also agreed to submit to exclusive personal jurisdiction of Ohio state and federal courts notwithstanding the American Arbitration Association administering the mandatory arbitration.[29]

### *Mr. Iezzi signs the Employment Agreement including a mandatory arbitration obligation.*

Mr. Iezzi signed the Employment Agreement on August 24, 2021 using the DocuSign tool.[30]

Mr. Iezzi's e-signature appears directly below the following provisions:

> I understand and agree to this binding Arbitration Agreement, and that both I and the Company give up our right to trial by jury of any claim I or the Company may have against each other. My signature below indicates my choice to agree to the alternative dispute resolution processes described herein.

**MY SIGNATURE BELOW CERTIFIES THAT I HAVE READ, I UNDERSTAND AND I AGREE TO BE LEGALLY BOUND TO ALL OF THE ABOVE TERMS, MY SIGNATURE ALSO CERTIFIES THAT I HAVE BEEN PROVIDED THE OPPORTUNITY TO HAVE THIS AGREEMENT REVIEWED BY LEGAL COUNSEL OF MY CHOICE, HAVE CONSULTED WITH COUNSEL OR HAVE WILLINGLY WAIVED SUCH OPPORTUNITY.**

**DO NOT SIGN UNTIL YOU HAVE READ THE ABOVE AGREEMENT AND ACKNOWLEDGMENT.**[31]

Mr. Iezzi later claimed he did not read the arbitration obligation in the Employment Agreement in either the March or August 2021 offers.[32] He did not consult with an attorney before signing the Employment Agreement.[33] CrossCountry does not verbally inform prospective employees about the arbitration obligation unless a potential employee specifically requests information.[34]

### *CrossCountry terminates Mr. Iezzi's employment in November 2022 and he sues.*

CrossCountry terminated Mr. Iezzi's employment in November 2022.[35] Mr. Iezzi then sued for unlawful termination under the Americans with Disabilities Act, the Age Discrimination in Employment Act, and the Pennsylvania Human Relations Act.[36] CrossCountry moved to compel arbitration.[37] Mr. Iezzi opposed arguing the mandatory arbitration obligation is unconscionable.[38] We ordered limited discovery for the parties to develop facts relating to Mr. Iezzi's unconscionability argument.[39]

### *CrossCountry renewed its arbitration arguments after limited discovery.*

CrossCountry now moves to compel arbitration and dismiss the Complaint after discovery.[40] It argues the arbitration obligation vests the gateway question of arbitrability in an arbitrator and Mr. Iezzi's claims fall within the scope of a valid and enforceable arbitration obligation. Mr. Iezzi disagrees. Mr. Iezzi argues the enforceability of the arbitration obligation is

for us, not the arbitrator, to decide because the parties did not clearly and unmistakably delegate the enforceability question to an arbitrator.[41]  Mr. Iezzi argues evidence adduced in discovery confirms the arbitration obligation is not enforceable because Mr. Iezzi did not knowingly or voluntarily waive his rights as CrossCountry economically pressured him into signing the Employment Agreement immediately and he did not understand its terms.[42] Mr. Iezzi also contends the arbitration obligation is unconscionable in part because CrossCountry misleads potential employees as to their rights to pursue anti-discrimination claims in court.[43] Mr. Iezzi lastly asks we stay the case should we compel arbitration and further find equitable tolling applies.[44]

We apply the summary judgment standard to our analysis following discovery.[45]  We find no genuine issue of material fact Mr. Iezzi's claims CrossCountry discriminated against him during his employment must be timely resolved through the contractually agreed mandatory arbitration.

## II.   Analysis

Congress, through the Federal Arbitration Act, requires us to enforce arbitration obligations according to their terms.[46] A party must arbitrate if (1) there is a valid agreement to arbitrate between the parties and, (2) the merits-based dispute falls within the scope of the valid agreement.[47]

The facial clarity of this two-step analysis is deceiving.  There are several questions built into our final decision.  Deciding whether to enforce contractual arbitration obligations could be a first-year law school Contracts exam. So we resort to our training and identify and then analyze each step. We must first address whether the parties intended to submit a specific dispute to arbitration.[48] The next inquiry is the "who-decides" question: do judges or arbitrators decide the arbitrability question? We employ certain presumptions in this area. Judges generally decide

substantive arbitrability issues, such as the scope, validity, and enforceability of an arbitration agreement; arbitrators generally decide procedural arbitrability questions including "whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met."[49]

We also make presumptions about "who decides" based on which part of the contract Mr. Iezzi challenges. Arbitration obligations are often contained within larger contracts such as employment agreements. Under our Court of Appeals' doctrine of severability, an arbitration obligation contained within a broader contract is "severable and independently enforceable from the rest of the contract in which it is contained."[50] Because arbitration obligations "typically reside in larger contracts" and the arbitration clause is severable from the contract containing the clause, questions about the enforceability of the larger contract—or the "container" contract—go to arbitration.[51] A party raises an enforceability challenge when they do not dispute a contract exists, but they argue we should not enforce the contract based on contract defenses including duress, frustration of purpose, or unconscionability. An employee arguing the "container" employment agreement is unconscionable is making an enforceability challenge which goes to arbitration.

But questions about the existence or formation of the container contract present a different challenge entirely.[52] Congress, in section 4 of the Federal Arbitration Act, "'affirmatively requires' a court to decide questions about the formation or existence of an arbitration agreement, namely the element of mutual assent."[53] "A claim that the container contract lacked mutual assent necessarily puts the existence of the arbitration agreement at issue" and thus goes "straight to court."[54] Unlike enforceability challenges, parties making contract formation challenges dispute a contract even exists.

The ultimate arbitrability question in this case is whether the Employment Agreement's

arbitration obligation binds Mr. Iezzi. The second level of inquiry is who decides whether Mr. Iezzi is bound by the arbitration obligation: us or the arbitrator?

But there is yet another third level of inquiry: the delegation question. The Supreme Court in *Rent-A-Center, West, Inc. v. Jackson* instructs parties may contractually agree to submit arbitrability questions to the arbitrator rather than a court.[55] Such provisions—called "delegation provisions"—confer on the arbitrator authority to decide "gateway" or "arbitrability" issues including whether the parties agreed to arbitrate or whether their agreement covers a particular controversy.[56] An agreement to arbitrate "gateway" issues of arbitrability "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the [Federal Arbitration Act] operates on this additional arbitration agreement just as it does on any other."[57]

A delegation provision is, like today, typically contained within an arbitration provision contained within a container contract such as an employment agreement. As our Court of Appeals explained, "Think of a delegation provision as a mini-arbitration agreement within a broader arbitration agreement within a broader contract, 'something akin to Russian nesting dolls.'"[58]

In sum, we must consider these nesting dolls when determining "who decides": is Mr. Iezzi challenging the arbitration obligation or the Employment Agreement (the "container" contract)? We must also consider the nature of his challenge: is Mr. Iezzi making a substantive and/or a procedural unconscionability challenge to the arbitration obligation?  Or is he making a contract formation or enforceability challenge to the Employment Agreement?  And he could be doing all three.

Mr. Iezzi's arguments can be broken into three parts: (1) the arbitration obligation does not contain a "clear" and "unmistakable" delegation of the arbitrability question to the arbitrator so we

must resolve this question; (2) he did not knowingly or voluntarily waive his rights to pursue an anti-discrimination claim in court because CrossCountry economically coerced him into signing the Employment Agreement; and (3) the arbitration obligation is unconscionable.

Before we resolve "who decides" each of these issues, we must determine the smallest of the nesting dolls: whether the parties clearly and unmistakably agreed to delegate arbitrability questions to the arbitrator. We find the parties did not clearly and unmistakably delegate arbitrability questions to the arbitrator given references to an exclusive forum in arbitration but then consent to personal jurisdiction in the Ohio state and federal courts with no carve-out or qualifying language.

And we then find Mr. Iezzi's claims fall within the scope of a valid agreement to arbitrate. We leave Mr. Iezzi's challenge to the enforceability of the entire Employment Agreement—and whether he agreed to the Employment Agreement under duress—for the contractually chosen arbitrator.

### A. We decide whether the claims are arbitrable given conflicting language in the Employment Agreement as to the forum.

Mr. Iezzi and CrossCountry dispute whether the arbitration obligation delegates gateway questions of arbitrability. CrossCountry argues the parties "clearly and unmistakably" agreed to delegate the issue of arbitrability to an arbitrator by incorporating the Rules of the American Arbitration Association.[59] Mr. Iezzi counters the arbitration obligation is silent on the issue of who decides arbitrability and the governing law clause makes it unclear whether such a delegation exists.[60]

Contrary to Mr. Iezzi's contention, the arbitration obligation is not "silent" on the issue of who decides arbitrability. Mr. Iezzi and CrossCountry agreed to settle all disputes "by binding arbitration administered by the American Arbitration Association ('AAA') … pursuant to AAA's

Employment Arbitration Rules and Mediation Procedures (found at https://www.adr.org)[.]"[61] Our Court of Appeals and a number of our colleagues held language in an arbitration obligation incorporating the Rules of the American Arbitration Association is evidence the parties "clearly and unmistakably" delegated the question of arbitrability to the arbitrator.[62]

We are guided by the language reviewed by Chief Judge Wolfson in *Carrone v. UnitedHealth Group Inc.,* where an employee agreed: "[t]he rules and procedures to be used by the parties are generally based on the Employment Dispute Resolution Rules of the AAA" and "[t]he AAA [r]ules shall govern issues not specifically addressed by this [Agreement]."[63] Chief Judge Wolfson found "clear and unmistakable evidence" of an agreement to delegate the issue of arbitrability because (1) the agreement expressly incorporated the Employment Dispute Resolution Rules of the American Arbitration Association rules; (2) one of the Employment Dispute Resolution Rules stated "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement ... [and] to determine the existence or validity of a contract of which an arbitration clause forms a part"; and, (3) the incorporated rules could be easily identified and ascertained by reference to a separate document "as these are the only [American Arbitration Association] rules regarding employment arbitration."[64]

CrossCountry argues the parties "clearly and unmistakably" intended to delegate the question of arbitrability because, as in *Carrone*, the arbitration obligation incorporates the American Arbitration Association's Employment Arbitration Rules and Mediation Procedures, including Rules 6(a) and (b) which provide "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of

the arbitration agreement" and "the existence or validity of a contract of which an arbitration clause forms a part."[65]

  We agree the arbitration obligation in the Employment Agreement, standing alone, could provide clear and unmistakable evidence of an intent to delegate to the arbitrator. But the reference to AAA's administration and governing rules may not be the last word. Confusing or ambiguous references in an employment agreement may cut against a clear finding of the arbitrator deciding the gateway question. Our Court of Appeals directed "the incorporation of [American Arbitration Association] Rules (or other arbitral rules) provides clear and unmistakable evidence of intent to delegate, as long as a contract does not 'otherwise muddy the clarity of the parties' intent to delegate.'"[66]

  Mr. Iezzi argues the Ohio governing law provision muddies the clarity of the parties' intent to delegate. The governing law provision provides "[t]he validity, interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of Ohio" and "[e]ach party agrees to submit to exclusive personal jurisdiction of the state and federal courts located in the State of Ohio."[67] Mr. Iezzi argues this provision shows the parties did not delegate the issue of arbitrability to an arbitrator and arbitrability is instead a question for us to decide.

  We agree with Mr. Iezzi on this point as guided by two recent thoughtful reviews of similar issues. We are guided by Vice Chancellor Laster's reasoning in *Fairstead Capital Management LLC v. Blodgett*.[68] Vice Chancellor Laster considered whether an employment arbitration agreement between Fairstead Capital Management and one of its principals contained a valid delegation clause. Vice Chancellor Laster reasoned the agreement contained clear and unmistakable evidence of an intent to delegate the who-decides question to the arbitrator because the agreement incorporated the rules of the Judicial Arbitration and Mediation Services, and the

JAMS rules empower an arbitrator to decide substantive questions of arbitrability.[69] Vice Chancellor Laster reasoned generally the incorporation of rules from an arbitral tribunal with rules stating arbitrability questions are for the arbitrator to decide is enough to require him to defer to the arbitrator.[70] But the agreement also contained a choice-of-forum provision calling for litigation in court: "Any action or proceeding hereunder must be commenced and prosecuted exclusively in the state or Federal courts located in the State of Delaware[.]"[71]  Vice Chancellor Laster held the court must determine arbitrability, reasoning, "The competing forum provisions prevent the court from finding clear and unmistakable evidence of an intent to arbitrate arbitrability[.]"[72]

We, like Vice Chancellor Laster, are mindful our Court of Appeals reached the same conclusion four months ago on different grounds.  In *Field Intelligence Inc. v. Xylem Dewatering Solutions Inc.*, the parties agreed to arbitrate all disputes arising out of their agreement under the rules of the American Arbitration Association, and then the parties entered a second agreement containing an integration clause and providing contract disputes must be resolved in a state or federal court in New Jersey.[73] Our Court of Appeals framed the question as "whether, by the later contract, the parties intended to extinguish their prior agreement and litigate any disputes between them moving forward"—i.e., a question of whether an arbitration agreement even existed.[74] Our Court of Appeals held this question is for the court to decide, reasoning "it can hardly be said that contracting parties clearly and unmistakably agreed to have an arbitrator decide the existence of an arbitration agreement when one of the parties has put the existence of that very agreement in dispute."[75]

We face conflicting language as well.  We find it is hardly "clear" the parties intended to delegate arbitrability questions to the arbitrator when we read the arbitration obligation alongside the exclusive personal jurisdiction in courts mandate in the Employment Agreement. We

appreciate CrossCountry's claim of clarity especially since consent to personal jurisdiction can be read for purposes of enforcing or vacating an arbitration award or for issues outside of the scope of arbitration. But we find CrossCountry did not clearly state its intent in the Employment Agreement. CrossCountry included language mandating arbitration but then included language providing consent to the exclusive jurisdiction of the state and federal courts in Ohio. CrossCountry asserts Mr. Iezzi's anti-discrimination claims do not go to a court in any state. So why would CrossCountry include language about jurisdiction of the state and federal courts without limiting its applicability to matters not within the mandatory arbitration or to vacate or confirm an arbitration award? CrossCountry includes inartful language about resort to courts when it claims Mr. Iezzi cannot go to court. We appreciate the AAA arbitration rules apply but CrossCountry's language about exclusive personal jurisdiction in the state and federal courts in Ohio cuts against the exclusive arbitration forum. It muddies the parties' intent to delegate these questions exclusively to an arbitrator at a minimum.

The competing forum provisions prevent us from finding clear and unmistakable evidence of an intent to arbitrate arbitrability. We—not the arbitrator—must decide whether (1) there is a valid agreement to arbitrate between the parties and, if so, whether (2) the merits-based dispute falls within the scope of the valid agreement.

### B. Mr. Iezzi and CrossCountry entered a valid arbitration obligation.

Mr. Iezzi argues he did not knowingly or voluntarily waive his rights to bring his anti-discrimination claims in court because (a) he lacked sufficient education to understand the rights he waived, (b) he did not have enough time to review the Employment Agreement, (c) the manager pressured him into signing the Employment Agreement by threatening to revoke his job offer, (d) the manager did not communicate he had five days or communicate he had time to have an attorney

review the agreement, (e) CrossCountry's Human Resources Department did not offer meaningful guidance as to what he was signing, and (f) the Employment Agreement lacks sufficient clarity. CrossCountry counters Mr. Iezzi's arguments fail because they are based on him claiming he did not read the arbitration obligation and the evidence adduced during discovery confirms the arbitration obligation is valid and enforceable. CrossCountry argues we must stay the case and compel arbitration.

We must first consider what law we should apply. Mr. Iezzi asks us to apply a federal common law "totality of the circumstances" standard to determine whether he knowingly and voluntarily waived his right to pursue discrimination claims in court. The "knowing and voluntary" standard is a heightened federal common law standard for determining whether someone waived their right to a jury trial under the Seventh Amendment.[76] Our Court of Appeals and several courts in our District instruct the "knowing and voluntary" waiver standard is inconsistent with the Congress's strong policy favoring arbitration.[77] We do not apply the heightened standard here.

Although we decline to apply the heightened "knowing and voluntary" standard here, we consider Mr. Iezzi's arguments to the extent they bear on generally applicable principles of state contract law. The Federal Arbitration Act provides arbitration agreements are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract."[78] "[S]tate contract law governs issues of formation, such as validity, revocability, and enforceability, with respect to the arbitration clause."[79] The Employment Agreement provides it shall be governed by Ohio law.[80] Contractual choice of law provisions are valid and enforceable under Ohio law.[81]  The parties do not appear to dispute the application of Ohio law.  We will apply Ohio law today to determine the enforceability of the arbitration obligation.

We interpret the bulk of Mr. Iezzi's arguments as challenging the procedural or substantive

conscionability of the arbitration obligation – challenges we are empowered to hear.[82] We find the arbitration obligation is not procedurally unconscionable and Mr. Iezzi's failure to read it does not excuse his obligation. We need not consider Mr. Iezzi's arguments as to substantive unconscionability. Mr. Iezzi entered a valid arbitration obligation as a condition of his employment with CrossCountry. We may not consider Mr. Iezzi's challenge to the enforceability of the Employment Agreement based on duress or economic coercion as this is a question reserved for the arbitrator.

### 1. The arbitration obligation is not procedurally unconscionable.

Mr. Iezzi argues the arbitration obligation is procedurally unconscionable because "no voluntary meeting of the minds" was possible based on his education, his limited time to review the arbitration obligation, and CrossCountry's lack of guidance regarding the arbitration obligation.[83] CrossCountry counters Mr. Iezzi's experience, background, and education "more than equipped him" to understand the terms of the arbitration obligation.[84] We find the adduced evidence confirms the arbitration obligation is not procedurally unconscionable as Mr. Iezzi had sufficient education, time, and resources to review the arbitration obligation and understand the rights he waived.

"Ohio law requires both procedural and substantive unconscionability to render an arbitration agreement invalid."[85] "Procedural unconscionability involves those factors bearing on the relative bargaining position of the contracting parties, including their age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible."[86] "Procedural unconscionability concerns the formation of the agreement and occurs when no voluntary meeting of the minds is possible."[87] "There can be no true meeting of the minds when a party is unable to understand the agreement."[88]

Mr. Iezzi seemingly argues his point by distinguishing Judge Varlan's analysis in *Patton v. Volkswagen Grp. Of Am. Chattanooga Operations, LLC.*[89]  We appreciate Mr. Iezzi's notice of contrary authority but are not persuaded by his attempt to distinguish Judge Varlan's analysis.  Ms. Patton agreed to arbitrate disputes as a condition of her employment as a laboratory engineer specialist for a new employer.[90]   Ms. Patton argued her employer could not enforce the mandatory arbitration because she did not have enough time to review the agreement and felt "pressured" to read a "thick stack of forms" quickly.[91] Ms. Patton argued her employer misled her by telling her "she was filling out hiring paperwork and health insurance forms rather than signing an arbitration agreement."[92]   Judge Varlan rejected Ms. Patton's arguments and found Ms. Patton voluntarily and knowingly entered into the arbitration agreement under Tennessee law.  Judge Varlan reasoned Ms. Patton's education weighed in favor of finding a knowing and voluntary waiver of rights because Ms. Patton completed two years of community college and held several professional positions before working with the new employer.[93] Judge Varlan found Ms. Patton had sufficient time to review the agreement because the employer mailed the new hire packet including the arbitration agreement to Ms. Patton three days before she began working, her employer did not discourage questions about the agreement or claim it was not a contract, and her employer's benefits specialist gave a detailed presentation to new hires on forms to sign including the arbitration obligation.[94]  Judge Varlan rejected Ms. Patton's arguments she did not understand  the allegedly misleading terms, reasoning "a party is presumed to know the contents of a contract she signs."[95]

Judge Varlan's decision in *Patton* harms, rather than helps, Mr. Iezzi's position. Like Ms. Patton, Mr. Iezzi completed some courses at a community college and held professional positions prior to joining CrossCountry.  The developed post-discovery record shows Mr. Iezzi graduated

high school and completed some English, history, and business courses at a community college.[96] Mr. Iezzi held managerial positions in the mortgage industry for about two decades during which time he reviewed attorney-drafted documents to ensure compliance with changing zoning requirements.[97] Mr. Iezzi even has experience litigating employment discrimination claims.[98]

Mr. Iezzi also had more time than Ms. Patton to review the Agreement.  Ms. Patton had three days to review the Agreement, whereas Mr. Iezzi had at least four days.[99]  We are not persuaded by Mr. Iezzi's argument he should have been given "at least a five-day review period" according to CrossCountry's informal policy. Mr. Iezzi received the same Employment Agreement—or a similar one—months earlier when CrossCountry first offered Mr. Iezzi a job in March 2021.[100] CrossCountry did not discourage questions about the agreement or claim it was not a contract.   While Mr. Iezzi did not have the benefit of a detailed presentation explaining the forms he had to sign (like Ms. Patton), the record shows Mr. Iezzi, an experienced businessman, asked questions about the Agreement and discussed its terms with management at CrossCountry.[101]  Mr. Iezzi never asked for additional time to review it.

The fact Mr. Iezzi now claims he did not read the arbitration obligation is no excuse under well-settled law. "Under Ohio law and the [Federal Arbitration Act], arbitration cannot be forced on parties who do not consent to it."[102]  But a party cannot "be excused from knowing what rights he waived by signing" an agreement and "a party to a contract is presumed to have read what he or she signed and cannot defeat a contract by claiming not to have read it."[103]

Mr. Iezzi does not assert a physical or mental condition impeding his ability to read, review, or understand the Employment Agreement. He swears he did not "understand" what he was agreeing to and only "read part of the agreement."[104]   But Mr. Iezzi acknowledged, understood, and agreed to resolve all disputes arising out of his employment using binding arbitration.[105]  He

also confirmed he "underst[ood] and agree[d]" to give up his right to trial by jury of any claim.[106] He spoke with his soon-to-be-manager and could have asked questions about the arbitration obligation at that time. Mr. Iezzi did none of these things; he instead demonstrated his objective intent to be bound by the Employment Agreement, including the arbitration obligation, by his e-signature on August 24, 2021.[107]

### 2. We are not persuaded by a California state court's decision finding CrossCountry's arbitration obligation unconscionable for another employee.

CrossCountry brings to our attention a decision from a California state court finding its arbitration obligation to be unconscionable. In *Doe v. CrossCountry Mortgage LLC*, Judge Bacal of the Superior Court of California, San Diego County, found CrossCountry's arbitration obligation unconscionable.[108] Judge Bacal found evidence of procedural unconscionability because it was "a contract of adhesion, embedded in a general employment contract, and a copy of the [American Arbitration Association] rules was not provided."[109] Judge Bacal held the arbitration obligation substantively unconscionable because it contained an Ohio choice of law provision and the former employee did not have any ties to Ohio.[110] Judge Bacal denied CrossCountry's motion to compel arbitration.[111] Mr. Iezzi contends we can "take judicial notice of the case and ascribe what value [we] may to it."[112]

We are not similarly persuaded the Ohio choice of law is always procedurally and substantively unconscionable. We respectfully disagree with the finding of procedural unconscionability in *Doe v. CrossCountry* based on finding the arbitration obligation is one of adhesion. The evidence adduced after discovery relating to Mr. Iezzi and the circumstances surrounding the contract formation, detailed above, lead us to a different finding. Mr. Iezzi felt free to reject the arbitration obligation because he did so in March 2021. CrossCountry continued to pursue him for employment. Mr. Iezzi had the opportunity to ask questions and negotiate the

terms of his Agreement. Mr. Iezzi is also asking us to apply Ohio law. We cannot discern how to square the idea of applying Ohio law if the employee believes applying Ohio law is unconscionable. And we reject the suggestion CrossCountry must provide potential employees a copy of the rules of the American Arbitration Association. The arbitration obligation does not suggest potential employees will be provided with a copy of the American Arbitration Association's rules. "And it's long been settled that parties can incorporate outside documents into a contract if their agreement says as much."[113]

### 3.    The arbitrator must decide the question of economic coercion/duress.

Mr. Iezzi argues it does not matter whether he read the arbitration obligation because CrossCountry subjected him to "economic coercion and/or duress" in forcing him to quickly sign the Employment Agreement four days after it provided it to him.[114] CrossCountry counters an arbitrator must decide this question because Mr. Iezzi's duress arguments are aimed at the Employment Agreement—the container contract—and not the arbitration obligation specifically.[115] We agree Mr. Iezzi's challenge to the Employment Agreement on the basis of duress or economic coercion must be heard by the arbitrator under the severability doctrine.

The Supreme Court in *Prima Paint Corp. v. Flood & Conklin Mfg. Co* defined the scope of severability in arbitration agreements.[116] The Court considered "whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators."[117] Prima Paint did not challenge the arbitration provision directly but instead claimed the contract was void because it was fraudulent induced. The Supreme Court held the arbitrator had to resolve the petitioner's claim. The Court reasoned under section 4 of the Federal Arbitration Act, the court must compel arbitration if it is satisfied "the making of the agreement for arbitration … is not in issue."[118] The Supreme Court reasoned because the arbitration agreement is severable from the contract in which it is contained, a party cannot avoid

arbitration by attacking the contract containing the arbitration agreement.[119]  "But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally."[120]

In the over fifty-five years since the Supreme Court's *Prima Paint* guidance, courts have generally recognized two types of challenges to arbitration: (1) challenges to the validity of the container contract as a whole and (2) challenges to the validity of the arbitration provision contained in the contract.[121] The arbitrator decides the first type of challenge, and the court decides the second type of challenge.[122]

Mr. Iezzi directs his duress challenge at the Employment Agreement as a whole.  He argues he was "pressured economically by the hiring manager to sign his employment agreement"; "was pressured to sign the Employment Agreement very quickly" and "the manager at issue…pressured him into signing the employment agreement with a threat of a revocation of a job offer."[123] He raises an enforceability challenge because he does not dispute the existence of the Employment Agreement, but he argues we should not enforce it because he agreed to it under duress. Because the arbitration obligation is severable from the Employment Agreement, questions about the enforceability of the Employment Agreement go to arbitration under our Court of Appeals' doctrine of severability.[124]

We find the parties agreed to a valid and procedurally conscionable arbitration obligation. Because the arbitration obligation is not procedurally unconscionable, we need not consider whether it is substantively unconscionable.[125]

**C.  Mr. Iezzi's claims are within the scope of the arbitration obligation.**

We now turn to whether Mr. Iezzi's claims fall within the scope of the arbitration obligation.  Mr. Iezzi argues we "should find that its scope deliberately meant to exclude all anti-

discrimination claims filed with the [Equal Employment Opportunity Commission]" based on its language excluding administrative charges before the Equal Employment Opportunity Commission. CrossCountry responds Mr. Iezzi's claims of unlawful termination under the Americans with Disabilities Act, the Age Discrimination in Employment Act, and the Pennsylvania Human Relations Act fall within the scope of the arbitration obligation which apply to "any claim" arising between the parties and contain only a narrow waiver for certain agency claims.[126] We find Mr. Iezzi's claims fall within the scope of the arbitration obligation.

Mr. Iezzi relies on decisions from Judges Smith and Haines even though both found arbitration obligations agreed by different employees with different employers enforceable.[127] Mr. Iezzi argues the arbitration obligations in those cases, unlike here, contain "qualifying" or "explanatory" language clearly defining disputes excluded from mandatory arbitration. Ms. Davidow, for example, agreed to arbitrate all claims against her employer in her employment agreement as a tax professional:

> Nothing in this Agreement shall prohibit Associate from filing a charge or complaint with the U.S. Equal Employment Opportunity Commission… **however, any Covered Claim that is not resolved through the federal, state, or local agency proceedings must be submitted to arbitration** in accordance with this Agreement, except for claims within the jurisdiction of the NLRB and where expressly precluded by a federal statute or regulation.[128]

Ms. Davidow argued the agreements did not contain mutual promises to arbitrate because it excluded disputes the employer, rather than the employee, is more likely to bring.[129] Judge Smith rejected this argument reasoning Ms. Davidow and her employer agreed to arbitrate certain disputes regardless of which party brings the claim.[130] Judge Smith granted the employer's motion to compel. Judge Haines in *Barnes v. Festival Fun Parks* enforced an arbitration agreement with carve-out language: "this mutual agreement does not limit Employee's right to file an

administrative charge with the ... Equal Employment Opportunity Commission, or any state agency, but Employee agrees to arbitrate under this Agreement all rights to any form of recovery or relief."[131]

Mr. Iezzi argues CrossCountry's carve-out language is not sufficiently clear because it does not contain the same "qualifying or exculpatory" language presented in *Davidow* and *Barnes,* which expressly identified agency claims are excluded from arbitration while court claims are not.[132]  We disagree.  Mr. Iezzi signed an Employment Agreement containing an arbitration obligation applying to "any claim…arising from, related to, or having any relationship or connection whatsoever with" Mr. Iezzi's employment and excluding "claims that are not arbitrable pursuant to federal and state law…including the right to file an administrative charge before a government agency, such as the Equal Employment Opportunity Commission[.]"[133] CrossCountry's language is clear claims filed with a government agency may be excluded from the arbitration obligation, and actions filed in court for analogous claims are not excluded.  The jury trial waiver, in which Mr. Iezzi agreed "both I and the Company give up our right to trial by jury of any claim," provides further clarity.[134]  We join our colleagues who considered similar arbitration obligations in finding CrossCountry's language clearly explains which disputes are excluded from the scope of mandatory arbitration and which disputes are not.[135]

Mr. Iezzi's anti-discrimination claims fall within the scope of the mandatory arbitration obligation.  The parties agreed (subject to an arbitrator's timely finding some duress or coercion invalidates the Employment Agreement) to mandatory arbitration of "any claim, dispute, and/or controversy…arising from, related to, or having any relationship or connection whatsoever with [Mr. Iezzi] seeking employment with, employment by, or other association with [CrossCountry]."[136] Mr. Iezzi's claims CrossCountry violated the Americans with Disabilities Act,

the Age Discrimination in Employment Act, and the Pennsylvania Human Relations Act are claims he has against CrossCountry arising from his employment. Mr. Iezzi alleges CrossCountry failed to accommodate his health conditions including anxiety and issues related to blood regulation and terminated him in retaliation for taking medical leave to care for his worsening health conditions.[137] Mr. Iezzi retained his statutory right to file a charge of discrimination with the Equal Employment Opportunity Commission under the terms of the arbitration obligation, and he exercised this right.[138]

Mr. Iezzi's claims fall within the scope of a valid agreement to arbitrate.

### D.    We stay progress in our Court pending arbitration and decline to address Mr. Iezzi's request for a finding as to equitable tolling arguments.

Mr. Iezzi requests a stay pending arbitration if we send the parties to mandatory arbitration.[139] CrossCountry does not address Mr. Iezzi's argument we should stay (rather than dismiss) the matter but it moves for dismissal.[140] "The plain language of [section 3 of the Federal Arbitration Act] affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration."[141] We stay the matter subject to reporting timely progress in the chosen forum while holding our progress in abeyance but consistent with Rule 1.[142]

Mr. Iezzi asks us to find (presumably through an unpleaded claim for declaratory relief) his claims are equitably tolled because he did not sit on his rights and it is "inequitable to allow a defendant to ignore the suit for months not only to seek to compel arbitration—but also to claim that a plaintiff's claims were untimely."[143] This argument, to the extent relevant, is an issue of procedural arbitrability for the arbitrator—not the courts—to decide.[144]

We are not persuaded by Mr. Iezzi's reliance again on decisions in a different context. Mr. Iezzi cites decisions in which judges considered requests for equitable tolling, but only *after* the judges entered Orders compelling arbitration, the arbitrator weighed in, and the disputes returned

to the judge.[145]  These cases support the argument equitable tolling is a procedural issue to be decided first by the arbitrator. Mr. Iezzi also relies on several decisions interpreting the timeliness of arbitration demands under statutes explicitly providing for arbitration, including the Multiemployer Pension Plan Amendments Act.[146]  These cases are distinguishable because they involve arbitration arising under a statute which explicitly sets time limits for initiating arbitration, whereas we face arbitration requirements fixed in a contract "under which parties could agree on the substantive scope of the arbitrator's power."[147]

We stay this matter pending arbitration and decline to address Mr. Iezzi's equitable tolling arguments.

### III.    Conclusion

We grant CrossCountry's Motion to compel, order Mr. Iezzi to arbitration, and stay the action subject to reporting progress consistent with Federal Rule 1.

---

[1] ECF No. 1, Complaint ¶ 15. Mr. Iezzi worked remotely but CrossCountry considered him based out of their Pennsylvania location.  *Id.* ¶¶ 12, 16.

[2] ECF No. 29, ¶¶ 26-29; ECF No. 33 ¶¶ 26-29.

[3] ECF No. 29, ¶¶ 32-33; ECF No. 33 ¶¶ 32-33.

[4] ECF No. 29, ¶ 32; ECF No. 33 ¶ 32.

[5] ECF No. 27-2 at 215a-216a.

[6] ECF No. 29, ¶¶ 33-34; ECF No. 33 ¶¶ 33-34.

[7] ECF No. 29, ¶ 46; ECF No. 33 ¶ 46.

[8] ECF No. 29, ¶ 15; ECF No. 33 ¶ 15.

[9] ECF No. 27-1 at 19a. CrossCountry's corporate designee swore the five-day review policy appears in the potential employee's offer letter, but this does not appear to be the case for Mr. Iezzi. *See id.*; ECF No. 27-3 at 339a-340a.

[10] ECF No. 29, ¶ 46; ECF No. 33 ¶ 46; ECF No. 27-3 at 319a.

[11] ECF No. 29, ¶ 48; ECF No. 33 ¶ 48.

[12] ECF No. 29, ¶ 48; ECF No. 33 ¶ 48. The record suggests the parties virtually met in July 2021. ECF No. 27-3 at 335a-338a.

[13] ECF No. 29, ¶ 49; ECF No. 33 ¶ 49.

[14] ECF No. 27-3 at 339a-340a. CrossCountry notified Mr. Iezzi in the Offer Letter: "This offer is contingent upon satisfactory results of a complete background screening, an executed employment agreement and other relevant due diligence based on your position." *Id.* at 340a.

CrossCountry's corporate designee swore CrossCountry typically sends the Employment Agreement after the prospective employee executes the offer letter and a background consent form. ECF No. 27-1 at 18a. It appears CrossCountry sent the Offer Letter *and* the Employment Agreement on August 19, 2021 and Mr. Iezzi signed the Offer Letter and the Employment Agreement on August 24, 2021.

[15] ECF No. 29, ¶ 50; ECF No. 33 ¶ 50.

[16] ECF No. 29, ¶ 52; ECF No. 33 ¶ 52.

[17] ECF No. 29, ¶ 53; ECF No. 33 ¶ 53.

[18] ECF No. 29, ¶ 54; ECF No. 33 ¶ 54.

[19] ECF No. 29, ¶ 55; ECF No. 33 ¶ 55; ECF No. 27-3 at 346a.

[20] ECF No. 29, ¶ 56; ECF No. 33 ¶ 56.

[21] ECF No. 27-1 at 7a.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* at 7a.

[26] *Id.* at 8a.

[27] *Id.*

[28] *Id.* at 7a.

[29] *Id.* at 7a, § 10.0 Governing Law.

[30] ECF No. 29, ¶¶ 13-14; ECF No. 33 ¶¶ 13-14; ECF No. 27-1 at 001a-9a.

[31] ECF No. 27-1 at 8a-9a (emphasis in original).

[32] ECF No. 29, ¶ 59; ECF No. 33 ¶ 59.

[33] ECF No. 29, ¶ 63; ECF No. 33 ¶ 63.

[34] ECF No. 29, ¶ 24; ECF No. 33 ¶ 24.

[35] ECF No. 1 ¶ 15.

[36] ECF No. 1.

[37] ECF No. 11.

[38] ECF No. 15.

[39] ECF No. 16.

[40] ECF Nos. 25-26.

[41] ECF No. 28 at 19.

[42] *Id.* at 5-6, 10-12.

[43] *Id.* at 15-18.

[44] *Id.* at 21-28. Mr. Iezzi also argues we should deny CrossCountry's Motion because it failed to comply with our Policies and Procedures. We rejected this argument in our December 19, 2023 Order finding good cause to resolve the merits given noncompliance with our Policies by both parties and the noncompliance did not materially alter our understanding of the limited discovery. *See* ECF No. 32.

[45] We granted the parties' limited discovery concerning unconscionability after finding Mr. Iezzi presented "reliable evidence that is more than a naked assertion…[he] did not intend to be bound by the arbitration agreement." ECF No. 16 n. 1 (citing *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 774 (3d Cir. 2013)). Following discovery, "[m]otions to compel arbitration are reviewed under the Federal Rules of Civil Procedure summary judgment standard…permitting judgment where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 228 (3d Cir. 2012) (citations omitted). We "may consider all affidavits, exhibits and discovery in the record." *Id.*

[46] *See* 9 U.S.C. §§ 2, 4.

[47] *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 142 (3d Cir. 2022) (citations omitted).

[48] We are guided by Vice Chancellor Laster's analysis and explanation of the three levels of inquiry in arbitration disputes almost a year ago in *Fairstead Capital Mgmt. LLC v. Blodgett*, 288 A.3d 729 (Del. Ch. 2023).

[49] *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 85 (2002) (internal quotations and citations omitted).

[50] *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397 (3d Cir. 2020).

[51] *Carrone v. UnitedHealth Grp. Inc*, No. 20-2742, 2021 WL 3520809, at *1 (3d Cir. Aug. 11, 2021) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967) ("Because an arbitration clause is severable from the contract that contains it, questions about the validity of the container contract go to arbitration.").

[52] *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 n. 2 (2010) ("The issue of the agreement's 'validity' is different from the issue whether any agreement between the parties 'was ever concluded[.]'").

[53] *MZM Constr. Co.*, 974 F.3d at 397-98 (footnote omitted) (citations omitted).

[54] *Carrone,* 2021 WL 3520809, at *1.

[55] 561 U.S. 63, 68–69, 71 (2010).

[56] *Id.* at 68-69.

[57] *Id.* at 70.

[58] *Carrone*, 2021 WL 3520809 at *1 (quoting *MZM Constr. Co.*, 974 F.3d at 399).

[59] ECF No. 26 at 6-8.

[60] ECF No. 28 at 15.

[61] ECF No. 27 at 8a, §10.0, Arbitration; Jury Waiver; Collective Action Waiver, (b).

[62] *Carrone*, 2020 WL 4530032, at *3 ("Numerous courts have found that, by incorporating the AAA rules, which need not be appended to the arbitration agreement, the parties have clearly and unmistakably committed to delegating the question of arbitrability to the arbitrator."); *See also Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020) (finding similar

language 'is about as clear and unmistakable as language can get.'); *Deardorff v. Cellular Sales of Knoxville, Inc.*, No. 19-2642, 2022 WL 407396, at *8 (E.D. Pa. Feb. 9, 2022) ("parties may 'clearly and unmistakably' delegate arbitrability issues to an arbitrator by incorporating by reference the American Arbitration Association ('AAA') or the Judicial Arbitration and Mediations Services ('JAMS') rules."); *Dobbs v. Health IQ Ins. Servs., Inc.*, No. 21-5276, 2022 WL 2974713, at *5 (E.D. Pa. July 27, 2022) (finding similar language constitutes "clear and unmistakable" delegation under Third Circuit case law); *Westerkamp v. Samsung Elecs. Am., Inc.*, No. 21-15639, 2023 WL 4172967, at *9 (D.N.J. June 26, 2023) ("The arbitration agreement also delegated the question of arbitrability to the arbitrator by incorporating the American Arbitration Association's rules into the agreement, one of which delegates the gateway issue of arbitrability to the arbitrator.") (citations and quotations omitted).

[63] 2020 WL 4530032 at *2.

[64] *Id.* at *2–*3.

[65] *See* https://www.adr.org/sites/default/files/EmploymentRules-Web.pdf.

[66] *PPT Research., Inc. v. Solvay USA, Inc.*, No. 20-2645, 2021 WL 2853269, at *3 (E.D. Pa. July 7, 2021) (quoting *Richardson*, 811 F. App'x at 103, n. 2),

[67] ECF No. 27–1 at 7a, § 10.0 Governing Law.

[68] *Fairstead Capital Mgmt. LLC*, 288 A.3d at 734.

[69] *Id.* at 757.

[70] *Id.*

[71] *Id.* at 740.

[72] *Id.* at 758.

[73] 49 F.4th 351, 354 (3d Cir. 2022).

[74] *Id.* at 356.

[75] *Id.* (quoting *MZM Constr. Co.*, 974 F.3d at 401).

[76] Mr. Iezzi relies on a federal common law standard. When applying federal common law, we are bound by the precedent from our Court of Appeals and the United States Supreme Court—not state law. *See Blakenship v. Zurich Am. Ins. Co.*, No. 4:08-604, 2009 WL 775579, at *6 (E.D. Mo. Mar. 20, 2009) ("When applying federal common law, binding precedent for all courts is set only by the Supreme Court. The district courts within a circuit are bound by the precedent set by the court of appeals for that circuit."). Because our Court of Appeals rejects the application of this

standard to arbitration agreements under the Federal Arbitration Act, we decline to apply the standard here.

[77] *See Marotta v. Toll Bros.*, No. 09-2328, 2010 WL 744174, at *6 (E.D. Pa. Mar. 3, 2010) (citing *Seus v. John Nuveen & Co.*, 146 F.3d 175, 183 (3d Cir. 1998)) ("The Court of Appeals for the Third Circuit has explicitly rejected a heightened 'knowingly and willfully' standard for arbitration agreements, holding that only a generally applicable principle of contract law, such as fraud or duress, may make an arbitration agreement unenforceable."); *Ggnsc Camp Hill W. Shore, LP v. Thompson*, No. 1:15-445, 2016 WL 3418490, at *6 (M.D. Pa. June 22, 2016) (declining to apply the heightened standard as inconsistent with the Federal Arbitration Act and our Court of Appeals' precedent); *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 224 (3d Cir. 2008) (same).

[78] 9 U.S.C. § 2.

[79] *Jones v. U-Haul Co. of Mass. & Ohio*, 16 F. Supp. 3d 922, 930 (S.D. Ohio 2014).

[80] ECF No. 27–1 at 7a.

[81] *CajumLand Pizza, LLC v. Marco's Franchising, LLC*, 513 F. Supp. 3d 801, 805 (N.D. Ohio 2021).

[82] *MZM Constr. Co.*, 974 F.3d at 397.

[83] ECF No. 28 at 16.

[84] ECF No. 26 at 15.

[85] *Clark v. Ridi Acct., LLC*, No. 3:22-589, 2022 WL 16715470, at *8 (N.D. Ohio Nov. 4, 2022).

[86] *Pearson v. ManorCare Health Servs.*, 2015-Ohio-5460, ¶ 28, 56 N.E.3d 306, 312 (Ohio Ct. App. 2015).

[87] *Arnold v. Burger King*, 2015-Ohio-4485, ¶ 71, 48 N.E.3d 69, 85 (Ohio Ct. App. 2015) (citations omitted).

[88] *Id.* at 87.

[89] *Patton v. Volkswagen Grp. of Am. Chattanooga Operations, LLC*, No. 1:16-327, 2017 WL 1288677 (E.D. Tenn. Apr. 6, 2017).

[90] *Id.* at *1.

[91] *Id.* at *8.

[92] *Id.*

[93] *Id.*

[94] *Id.* at *9.

[95] *Id.*

[96] ECF No. 27-2 at 178a, 180a:1-12.

[97] *Id.* at 211a:16-212a:16; 213a:1-214a:9; 269a - 270a.

[98] ECF No. 29, ¶ 42; ECF No. 33 ¶ 42.

[99] Mr. Iezzi received the Employment Agreement on the night of August 19, 2021, and signed the Employment Agreement, including the arbitration obligation, on August 24, 2021.  ECF No. 29, ¶¶ 50, 56; ECF No. 33 ¶¶ 50, 56.

[100] ECF No. 29, ¶ 46; ECF No. 33 ¶ 46.

[101] ECF No. 27-3 at 344a-347a.

[102] *Rickard v. Teynor's Homes, Inc.*, 279 F. Supp. 2d 910, 913 (N.D. Ohio 2003) (citing *Volt Info. Sciences, Inc. v. Bd. of Trs.*, 489 U.S. 468, 478 (1989); *Sweeney v. Grange Mut. Cas. Co.*, 146 Ohio App. 3d 380, 766 N.E.2d 212 (2001)).

[103] *Cole v. Temple Israel*, 2007 Ohio 245, 2007 WL 162973 at * 3 (Ohio Ct. App. 2007).

[104] ECF No. 27-2 at 229a:1-2; 240a:21-24.

[105] ECF No. 27-1 at 007a-008a.

[106] *Id.* at 8a.

[107] *Id.*

[108] ECF No. 27-3 at 348a-352a (Case No. 37-2021-00055029-CU-OE-CTL).

[109] *Id.* at 350a.

[110] *Id.* at 351a.

[111] *Id.*

[112] ECF No. 28 at 18.

[113] *Boyer v. Aetna Medicaid Administrators, LLC*, No. 1:23-141, 2023 WL 5229743, at *4 (N.D. Ohio Aug. 15, 2023); *see also, Carrone*, 2021 WL 3520809, at *2 ("an arbitration agreement can incorporate an unattached and unsigned delegation provision by reference.").

[114] ECF No. 28 at 6.

[115] ECF No. 26 at 20.

[116] 388 U.S. 395 (1967).

[117] *Id.* at 402.

[118] *Id.* at 403 (9 U.S.C. § 4).

[119] *Id.* at 403-04.

[120] *Id.* at 404.

[121] *Rent-A-Center*, 561 U.S. at 70.

[122] *Id.*

[123] ECF No. 28 at 5, 11, 15 (emphasis added).

[124] *Carrone,* 2021 WL 3520809, at *1 (citing *Prima Paint Corp.*, 388 U.S. at 403–04) ("Because an arbitration clause is severable from the contract that contains it, questions about the validity of the container contract go to arbitration.").

[125] *Clark*, 2022 WL 16715470, at *8 (Ohio law requires both procedural and substantive conscionability).

We read Mr. Iezzi's arguments about the clarity of the arbitration obligation as substantive unconscionability challenges. While we need not consider these arguments here because we find the arbitration obligation is not procedurally unconscionable, we address part of Mr. Iezzi's clarity arguments when determining whether his claims fall within the scope of the arbitration obligation.

[126] ECF No. 26 at 18-19.

[127] *Barnes v. Festival Fun Parks, LLC*, No. 3:22-165, 2023 WL 4209745, at *1 (W.D. Pa. June 27, 2023); *Davidow v. H&R Block, Inc.*, No. 18-1022, 2019 WL 2090690 (W.D. Mo. May 13, 2019).

Mr. Iezzi again relies on distinguishing authorities applying different state laws with different contract language and does not cite authority affirmatively supporting his position. We also note neither employee in these cases raised—and neither Judge addressed—the "unclear scope" argument raised by Mr. Iezzi.

[128] *Davidow*, 2019 WL 2090690, at *2 (emphasis added).

[129] *Id.* at *3.

[130] *Id.* at *4.

[131] *Barnes,* 2023 WL 4209745, at *1 (emphasis added).

[132] ECF No. 28 at 13.

[133] ECF No. 27-1 at 7a.

[134] *Id.* at 8a.

[135] *Cottrell v. Club Demonstration Servs.*, No. 06-14763, 2007 WL 2413070, at *3 (E.D. Mich. Aug. 2, 2007) (finding language "clear" where arbitration agreement provided "This Agreement does not cover claims for Workers' Compensation or Unemployment Compensation benefits or charges filed with government agencies."); *Williams v. Tesla, Inc.*, No. 18-4120, 2018 WL 6499867, at *3 (D.N.J. Dec. 11, 2018) (finding language unambiguous where agreement provided: "Arbitrable claims do not include, and this Agreement does not apply or otherwise restrict, administrative claims [he] may bring before any governmental agency where, as a matter of law, the parties may not restrict your ability to file such claims (including the Equal Employment Opportunity Commission or its state equivalent, and the National Labor Relations Board).").

[136] ECF No. 27-1 at 7a.

[137] ECF No. 1.

[138] ECF No. 28-4 at 5-7.

[139] ECF No. 27 at 28-29.

[140] ECF No. 25.

[141] *Lloyd v. Hovensa, LLC*, 369 F.3d 263, 269 (3d Cir. 2004).

[142] 9 U.S.C. § 3; *Lloyd*, 369 F.3d at 269.

[143] ECF No. 28 at 25.

[144] *Howsam*, 537 U.S. at 85 (reasoning "issues of procedural arbitrability, i.e., whether prerequisites such as ***time limits***, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide.") (emphasis added); *see also*, *Manlove v. Volkswagen Aktiengesellschaft*, No. 1:18-145, 2019 WL 7755928, at *8 (E.D. Tenn. June 11, 2019) ("Consideration of equitable tolling for claims brought in arbitration not only should be, but must be, left to the arbitrator."); *McGilley v. Sterling Jewelers, Inc.*, No. 12-5217, 2013 WL 1163983, at *10 (D.N.J. Mar. 18, 2013) ("The Court will deny Plaintiff's request for a legal determination regarding whether equitable tolling applies to the statute of limitations in the Agreement. That decision is the province of the arbitrator.").

[145] *Gibbens v. OptumRx, Inc.*, No. 3:16-00723, 2018 WL 5982955 (M.D. Tenn. Nov. 13, 2018), *aff'd*, 778 F. App'x 390 (6th Cir. 2019) (considering former employee's argument the arbitrator manifestly disregarded the law in not applying equitable tolling to her claim); *Ross Dress for Less Inc v. VIWP, L.P.*, 750 F. App'x 141 (3d Cir. 2018) (affirming district court's confirmation of an arbitration award); *Fonseca v. USG Ins. Servs., Inc.*, 467 F. App'x 260, 261 (5th Cir. 2012) (considering equitable tolling argument only after the American Arbitration Association declined to serve as arbitrator because USG did not pay the required arbitration fees); *Jefferson v. Baptist Health Sys., Inc.*, No. 2:14-1028, 2017 WL 445738, at *6 (N.D. Ala. Feb. 2, 2017) (affirming arbitration award and reasoning "the arbitrator had authority to resolve a dispute as to the timeliness of the arbitration demand."); *Zarecor v. Morgan Keegan & Co.*, 801 F.3d 882 (8th Cir. 2015) (reviewing district court decision where Zarecors pursued Financial Industry Regulatory Authority arbitration before filing in court and district court found the dispute was not subject to arbitration under the rules of the Financial Industry Regulatory Authority).

[146] *See Doherty v. Teamsters Pension Tr. Fund of Philadelphia & Vicinity*, 16 F.3d 1386, 1391 n. 4 (3d Cir. 1994); *Flying Tiger Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 659 F. Supp. 13, 18-19 (D. Del. 1986).

[147] *Doherty*, 16 F.3d at 1391 n.4 (explicitly drawing distinction between timeliness concerns in cases arising under the Multiemployer Pension Plan Amendments Act and timeliness concerns in cases arising under private contract and finding the latter is for the court—not the arbitrator—to decide).